UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JAIME ALONSO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00132-JAW |
| | ) | |
| AMERICAN EXPRESS COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION TO COMPEL ARBITRATION AND STAY**

A cardmember applied for, received, and used a new credit card issued by a defendant credit card company. The cardmember agreement, which sets forth the terms and conditions of the cardmember's membership, contains an arbitration provision. After the cardmember filed a lawsuit against the credit card company, the credit card company moved to compel arbitration and stay the lawsuit, pending arbitration. The Court concludes that it must compel arbitration in accordance with the enforceable arbitration provision included in the validly entered into contractual agreement between the plaintiff and the credit card company. As a result, the Court stays the action pending arbitration.

I.      **BACKGROUND**

A.      **Procedural History**

On April 12, 2022, Jaime Alonso filed a complaint against American Express Company (American Express)[1] in Maine state court seeking declarative and

---

[1]      Mr. Alonso erroneously sued Defendant American Express National Bank as American Express Company. The Court refers to the Defendant as American Express in its Order.

injunctive relief and alleging defamation. *Notice of Removal from York County Superior Court*, Attach 1, *State Court Summons and Complaint* (ECF No. 1) (*Compl.*). On May 10, 2022, American Express removed the case to this Court. *Notice of Removal* (ECF No. 1). On July 28, 2022, American Express filed its answer to Mr. Alonso's complaint. *Answer to Complaint* (ECF No. 12) (*Answer*).

On November 14, 2022, American Express filed its motion to compel arbitration and stay the action, *Mot. of Def. American Express National Bank to Compel Arbitration and Stay Action* (ECF No. 16) (*Def.'s Mot.*), and its motion for a protective order and to stay discovery pending ruling on its motion to compel arbitration. *Mot. of Def. American Express National Bank for Protective Order and to Stay Disc. Pending Ruling on its Mot. to Compel Arbitration* (ECF No. 17). On December 5, 2022, Mr. Alonso filed his response in opposition to American Express's motion to compel. *Pl.'s Opp'n to Mot. to Compel Arbitration and Stay Action* (ECF No. 18) (*Pl.'s Opp'n*). On the same day, he filed his response to American Express's motion for a protective order and to stay discovery. *Pl.'s Response to Motion for Protective Order and to Stay Discovery* (ECF No. 19). On December 7, 2022, the Court granted American Express's motion to stay discovery pending the Court's ruling on its motion to compel arbitration. *Order* (ECF No. 20). On December 19, 2022, American Express filed its reply in support of its motion to compel arbitration and stay the action. *Reply Mem. of Law in Supp. of Mot. of Def. American Express National Bank to Compel Arbitration and Stay Action* (ECF No. 21) (*Def.'s Reply*).

### B.    Factual Background

On or about January 31, 2017, Jaime Alonso applied for an American Express Business Platinum Card using his name, social security number, date of birth, address, phone numbers, and email address, and he identified his business, Wospac America, LLC (Wospac), as the associated business with the account.  *Def.'s Mot.*, Attach 1, *Decl. of Keith Herr* ¶ 4 (*Herr Decl.*).  Wospac is a limited liability company of which Mr. Alonso is the Sole Member and Manager.  *Compl.* ¶ 4.  In reliance on the information Mr. Alonso provided, American Express approved his application and opened Mr. Alonso's Business Platinum Card Account on January 31, 2017 (the "Account"), with Mr. Alonso as the Basic Cardmember and Wospac as the associated business, as requested by Mr. Alonso in his application for the Account.  *Herr Decl.* ¶¶ 3-4.  Consistent with its standard business practices, American Express then mailed Mr. Alonso his physical American Express card together with a copy of the governing Cardmember Agreement.  *Id.* ¶ 5, *Def.'s Mot.*, Ex. A, *Cardmember Agreement: Part 1 of 2 and Part 2 of 2.*

The Cardmember Agreement contains several relevant definitions.  First, the Cardmember Agreement defines "Basic Cardmember": "Except as provided below, ***Basic Cardmember*** means the person who applied for this Account or to whom we address billing statements." *Cardmember Agreement: Part 2 of 2* at 1.  Next, it defines "Company": "***Company*** means the business for which the Account is established." *Id.*  The Cardmember Agreement also defines "***You*** and ***your*** [to] mean the Basic Cardmember and the Company" and provides that "you agree, jointly and severally, to be bound by the terms of this Agreement." *Id.* at 1.  The Cardmember Agreement

3

further states: "When you or an Additional Cardmember . . . use the Account . . . you agree to the terms of the [Cardmember] Agreement." *Id.* Mr. Alonso received the physical American Express card together with the Cardmember Agreement that American Express mailed to him. Following the opening of the Account on January 31, 2017, Mr. Alonso made purchases on the Account. *Herr Decl.* ¶ 7; *Def.'s Mot.*, Ex. B, *Account Statement*. Mr. Alonso did not reject the Arbitration Provision in the Cardmember Agreement. *Herr Decl.* ¶ 6.

The Agreement includes a section entitled "Claims Resolution," which provides in pertinent part:

**Claims Resolution**

**. . . You may reject the arbitration provision by sending us written notice within 45 days after your first card purchase. See *Your Right to Reject Arbitration* below.**

For this section, *you* and *us* includes any corporate parents, subsidiaries, affiliates or related persons or entities. *Claim* means any current or future claim, dispute or controversy relating to your Account(s), this Agreement, or any agreement or relationship you have or had with us, except for the validity, enforceability or scope of the Arbitration provision. *Claim* includes but is not limited to: (1) initial claims, counterclaims, crossclaims and third-party claims; (2) claims based upon contract, tort, fraud, statute, regulation, common law and equity; (3) claims by or against any third party using or providing any product, service or benefit in connection with any account; and (4) claims that arise from or relate to (a) any account created under any of the agreements, or any balances on any such account, (b) advertisements, promotions or statements related to any accounts, goods or services financed under any accounts or terms of financing, (c) benefits and services related to card membership (including fee-based or free benefit programs, enrollment services and rewards programs) and (d) your application for any account. . .

**Arbitration**

4

You or we may elect to resolve any claim by individual arbitration. Claims are decided by a neutral arbitrator.

**If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or have a jury trial on that claim.  Further, you and we will not have the right to participate in a representative capacity or as a member of any class pertaining to any claim subject to arbitration.  Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited.  The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court.  Except as set forth below, the arbitrator's decision will be final and binding.  Other rights you or we would have in court may also not be available in arbitration.**

### Initiating Arbitration

. . . You or we may otherwise elect to arbitrate any claim at any time unless it has been filed in court and trial has begun or final judgment has been entered . . .

### Continuation

This section will survive termination of your Account . . ..

*Cardmember Agreement: Part 2 of 2* at 6-7.

Between November 11, 2019 and March 11, 2020, Wospac used a vendor, Legacy Global Sports (Legacy), to book flights to Spain for a particular sporting event for customers who had purchased sporting event packages.  *Compl.* ¶ 10.  Wospac paid Legacy $289,835.15 in total for the Booked Flights using its Business Account.  *Id.* ¶ 11.  On March 11, 2020, the World Health Organization declared the COVID-19 outbreak a global pandemic.  *Id.* ¶ 12.  As a result of the COVID-19 pandemic, all the flights on which Wospac had booked seats for its customers were cancelled.  *Id.* ¶ 13.  Wospac requested that Legacy refund the monies that Wospac had paid to Legacy for

the Booked Flights that were cancelled.  *Id.* ¶ 14.  Legacy declined to do so, even though Legacy received refunds from the airline companies.  *Id.*  Because Wospac had not received the Booked Flights for which it paid as a result of the flight cancellations, Wospac requested chargebacks from American Express for each of the flight purchases.  *Id.* ¶ 15.  A chargeback is the reversal of a transaction from the merchant back to the credit card holder.  *Id.* ¶ 16.  In other words, a chargeback involves American Express debiting the account of the merchant by the amount of the disputed transaction and crediting the account of the credit card holder with the same amount.  *Id.*  The Cardmember Agreement provides that, if Wospac "dispute[s] a charge with a merchant, [American Express] may credit the [Business] Account for all or part [of] the disputed charge."  *Id.* ¶ 17 (quoting *Cardmember Agreement: Part 2 of 2* at 5).

American Express initially approved the majority of the requested chargebacks that Wospac requested for the Booked Flights and paid Wospac $246,776.31 in a series of checks.  *Id.* ¶ 18.  The remaining charges remained under review by American Express.  *Id.*  Mr. Alonso frequently communicated with American Express regarding the remaining charges and American Express assured Mr. Alonso that American Express would credit Wospac for the remaining charges.  *Id.* ¶ 19.  Relying on American Express's decision to approve the majority of the requested chargebacks and its assurances that it would approve the remaining requests, Wospac refunded its customers for all Booked Flights, minus a 10% fee.  *Id.* ¶ 20.  In late May 2020, an involuntary Chapter 7 bankruptcy petition was filed against Legacy.  *Id.* ¶ 21.  On or

about June 15, 2020, American Express reversed the chargebacks that it had previously approved and charged Wospac's Business Account for the monies it had previously refunded. *Id.* ¶ 22. Mr. Alonso seeks declaratory and injunctive relief and brings a defamation claim against American Express. *Id.* ¶ 28-50. American Express seeks to compel Mr. Alonso to address his claims through arbitration.

## II.   THE PARTIES' POSITIONS

### A.   American Express' Motion to Compel Arbitration

American Express first argues that Mr. Alonso's "claims are subject to binding arbitration pursuant to the arbitration provision in the Cardmember Agreement." *Def.'s Mot.* at 6. It submits that "courts apply a presumption of arbitrability" and urges the Court to enforce that presumption here. *Id.* at 6-7 (collecting cases). American Express further submits that "the Cardmember Agreement between [Mr. Alonso] and American Express, which includes the Arbitration Provision, is expressly governed by a Utah choice-of-law provision" and "a valid agreement to arbitrate exist[s] under Utah law." *Id.* at 7.

American Express then argues that Mr. Alonso's claims "fall squarely within the scope of the arbitration provision" because the provision "expressly covers the types of claims at issue here." *Id.* at 10. American Express contends that the "broad contractual language plainly covers [Mr. Alonso]'s claims for declaratory relief concerning his contractual obligations," *id.*, and that "[b]ecause a written agreement to arbitrate exists . . . and American Express elects to resolve these claims through binding arbitration, the claims must be submitted to arbitration rather than litigated in court." *Id.* at 11. It contends moreover that "[a]ny doubts concerning the scope of

7

arbitrable issues 'should be resolved in favor of coverage.'" *Id.* at 10 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).  Finally, American Express argues that "[u]nder the FAA, the instant action should be stayed pending arbitration."  *Id.* at 11 (collecting cases).

### B.     Jaime Alonso's Opposition

Mr. Alonso first argues that "under the terms of the Cardmember Agreement, arbitration is permissive and neither American Express nor Mr. Alonso has elected arbitration."  *Pl.'s Opp'n* at 1.  He explains how the Agreement merely dictates that "if [the] customer or American Express chooses to resolve the dispute via arbitration, they may discretionarily do so."  *Id.* at 2.  He further contends that "[a]n arbitration begins through the submission of a claim or dispute for resolution to either J[udicial] A[rbitration and] M[ediation] S[ervices] or A[merican] A[rbitration] A[ssociation], with the party pushing for arbitration initially choosing an arbitrator . . . [and h]ere that has never happened."  *Id.* at 2-3.  In his view, the arbitration process described in the arbitration clause "establishes a permissive arbitration dynamic."  *Id.* at 2.

Mr. Alonso next argues "American Express has not shown that the Cardmember Agreement is binding on Mr. Alonso" because the "Agreement relates to Wospac, and . . . Wospac, not Mr. Alonso, is the account holder."  *Id.* at 3.  Mr. Alonso submits that "American Express professed . . . to have no information germane to Mr. Alonso's intent to bind himself personally in submitting a card application on behalf of Wospac," *id.*, and that the Agreement "does not facially apply to Mr. Alonso."  *Id.* at 4.  He further submits that "American Express has refused, throughout the

course of this proceeding and in the months of negotiations leading up to this action, to provide either Wospac or Mr. Alonso with relevant documents in connection with this matter." *Id.*

Finally, Mr. Alonso argues that "the timing of American Express's Motion—which comes on the eve of American Express's deposition and deadline to respond to discovery, and after Mr. Alonso has been prejudiced by American Express's delay—warrants denial of any request to compel arbitration." *Id.* He explains that "whether from a cost perspective or from the possibility that American Express might try to raise a limitations defense that it could not raise previously—there is palpable prejudice flowing from American Express's delay here." *Id.* at 5. He concludes that "[a]ccordingly, any right arising under the Cardmember Agreement to compel arbitration has been waived." *Id.*

### C.    American Express' Reply

American Express first submits that Mr. Alonso's "argument that the Arbitration Provision is not mandatory is contrary to the plain language in the Cardmember Agreement" because it "expressly provides that if arbitration is elected, then it is mandatory." *Def.'s Reply* at 2 (quoting "If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or have a jury trial on that claim"). It explains how "neither the Cardmember Agreement nor applicable law requires American Express to initiate an arbitration proceeding on behalf of the claimant" and the Agreement in fact instructs customers how to begin arbitration by contacting the Judicial Arbitration and Mediation Services (JAMS) or the American Arbitration Association (AAA). *Id.* at 4.

9

American Express then submits that Mr. Alonso's request "to 'test' American Express's proof of a valid agreement to arbitrate through discovery" should not be granted because "this Circuit has repeatedly held[] a party cannot avoid arbitration based on unsubstantiated, self-serving denials." *Id.* American Express explains how Mr. Alonso "fails to submit evidence demonstrating a material dispute with respect to the agreement to arbitrate." *Id.* American Express insists that Mr. Alonso's argument that the Agreement does not apply to him is "unavailing, having failed to provide any evidence that he is not bound to the Cardmember Agreement's terms as the Basic Cardmember." *Id.* at 5.

Finally, American Express submits that Mr. Alonso's "waiver argument likewise is unsupported and unpersuasive" because "upon notice of the pending action, American Express advised [Mr. Alonso] of his obligation to arbitrate any disputes and requested consent [which Mr. Alonso denied] to change forum in order to avoid unnecessary motion practice." *Id.* at 2-3. American Express asserts that it "has been attempting to enforce its arbitration rights since the beginning, and has only defended [Mr. Alonso]'s attempts to avoid his obligations under the Cardmember Agreement." *Id.* at 3. American Express further notes that it "expressly preserved its objection in its Answer and did not take advantage of discovery procedures available in federal court." *Id.* at 7.

## III.   LEGAL STANDARD

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 *et seq.*, provides that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and

enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* § 2.  The FAA embodies a "liberal federal policy favoring arbitration agreements." *Foss v. Circuit City Stores, Inc.*, 477 F. Supp. 2d 230, 232-33 (D. Me. 2007) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Campbell v. General Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 551 (1st Cir. 2005)). The Supreme Court "requires courts to enforce the bargain of the parties to arbitrate" and "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *KPMG LLP v. Cocchi*, 565 U.S. 18, 21-22 (2011) (citations omitted) (emphasis in original).

"To compel arbitration, the movant must demonstrate 'that a valid agreement to arbitrate exists, that [he] is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'" *Patton v. Johnson*, No. 18-1750, 2019 U.S. App., 2019 WL 516534, at *4 (1st Cir. Feb. 11, 2019) (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003)). "When deciding whether the parties agreed under the FAA to arbitrate a certain matter, courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 42 (1st Cir. 2012) (internal quotation marks omitted) (quoting *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 19 (1st Cir. 1999)).  This means that common contract defenses "such as fraud, duress, or unconscionability" are applicable. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

## IV.   DISCUSSION

American Express argues the Court must send the case to arbitration because the Agreement is valid and binding on Mr. Alonso, the Arbitration Provision is enforceable and mandatory, and the claims at issue are properly encompassed by the Agreement. *Def.'s Mot.* at 6-10 ; *Def.'s Reply* at 3-7. The Court agrees with American Express and concludes that American Express has demonstrated that a valid agreement to arbitrate exists, that it is entitled to invoke the clause, that the claim falls within the clause, and that Mr. Alonso has not met his burden of showing that the Arbitration Provision is invalid and / or does not encompass the claims at issue.

### A.   The Arbitration Provision is an Enforceable Provision in a Valid Contractual Agreement between Jaime Alonso and American Express

"To compel arbitration, the defendants 'must demonstrate that a valid agreement to arbitrate exists, that the[y are] entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'" *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 6 (1st Cir. 2014) (quoting *Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011)); *see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). An arbitration agreement governed by the FAA is presumed to be valid and enforceable. *See Shearson / Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985).

The party resisting arbitration bears the burden of showing that the arbitration agreement is invalid or does not encompass the claims at issue. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000). Section 2 of the FAA mandates that a binding arbitration agreement in a contract "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Mr. Alonso does not argue that the Arbitration Provision is unenforceable under the FAA. The Court therefore concludes the Arbitration Provision is enforceable and turns to whether the parties entered into a valid contractual agreement that encompasses the claims at issue.

The Supreme Court "requires courts to enforce the bargain of the parties to arbitrate" and "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *KPMG LLP*, 565 U.S. at 21-22 (citations omitted) (emphasis in original). "When deciding whether the parties agreed under the FAA to arbitrate a certain matter, courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Awuah*, 703 F.3d at 42 (citation and internal quotation marks omitted). Here, the Agreement provides that the Arbitration Provision is expressly governed by a Utah choice-of-law provision. *Cardmember Agreement: Part 2 of 2* at 5 ("Utah law and federal law govern this Agreement and the Account. They govern without regard to internal principles of conflicts of law"). Thus, while the FAA governs the

13

enforceability of the Arbitration Provision, Utah law governs the Court's determination of whether a valid agreement to arbitrate exists. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts").

Applying Utah law to determine whether the Arbitration Provision is a valid contractual agreement, the Court concludes it is. Utah law provides:

> A credit agreement is binding and enforceable . . . if: (i) the debtor is provided with a written copy of the terms of the agreement; (ii) the agreement provides that any use of the credit offered shall constitute acceptance of those terms; and (iii) after the debtor receives the agreement, the debtor, or a person authorized by the debtor, requests funds pursuant to the credit agreement or otherwise uses the credit offered.

UTAH CODE ANN. § 25-5-4(2)(e). Utah law expressly allows arbitration provisions to be included in open-end credit agreements. *See* UTAH CODE ANN. §§ 70C-4-102(2)(b) (providing that "[a] creditor may change an open-end consumer credit contract in accordance with this section to include arbitration or other alternative dispute resolution mechanism"), 70C-4-105(1) (providing that "a creditor may contract with the debtor of an open-end consumer credit contract for a waiver by the debtor of the right to initiate or participate in a class action related to the open-end consumer credit contract").

Here, as required under Utah law, American Express provided Mr. Alonso a copy of the Agreement along with his physical American Express card upon opening the account. *Herr Decl.* ¶ 5. The Agreement states:

**Your Right to Reject Arbitration**
You may reject this Arbitration provision by sending a written **rejection notice** to us at: American Express, P.O. Box 981556, El Paso, TX 79998 . . . Your rejection notice must be mailed within 45 days after your first card purchase. Your rejection notice must state that you reject the Arbitration provision and include your name, address, Account number and personal signature.

*Cardmember Agreement: Part 2 of 2* at 6. Mr. Alonso used his American Express credit card after receiving the card and the Agreement, thereby accepting the terms of the Agreement, including the Arbitration Provision. *See Compl.* ¶¶ 7, 9, 11. Mr. Alonso did not reject the Arbitration Provision in the Cardmember Agreement. *Herr Decl.* ¶ 6.

The Court concludes the Arbitration Provision is therefore a valid and enforceable agreement to arbitrate under Utah law. *See Aneke v. Am. Express Travel Related Servs., Inc.*, 841 F. Supp. 2d 368, 376, 378 (D.D.C. 2012) (holding that arbitration agreement is "valid and enforceable under Utah law, which is the relevant state law in this case" and rejecting plaintiffs' "policy argument about the limits of arbitration and the prejudicial impact it has on their statutory claims"); *Khanna v. Am. Express Co.*, 2011 U.S. Dist. LEXIS 146542, at *6-7 (S.D.N.Y. Dec. 14, 2011) (concluding the arbitration agreement is "binding and enforceable" under Utah law where cardmember agreement provided that use of the card constituted assent to the agreement's terms and plaintiff used the card); *Miller v. Corinthian Colls., Inc.*, 769 F. Supp. 2d 1336, 1348-49 (D. Utah 2011) (holding that arbitration provision is not substantively or procedurally unconscionable under Utah law); *Smith v. ComputerTraining.com Inc.*, 772 F. Supp. 2d 850, 856-57 (E.D. Mich. 2011) (enforcing

Utah choice-of-law provision and finding that arbitration provision is not unconscionable under Utah law), *aff'd*, 531 F. App'x 713 (6th Cir. 2013); *see MBNA Am. Bank, N.A. v. Goodman*, 2006 UT App. 276, ¶ 8, 140 P.3d 589, 592 ("In this case, Goodman was provided with a copy of the Agreement, the Agreement contained a provision that acceptance of the Agreement's terms occurred through use of the credit card, and Goodman undisputedly used the credit account.   Therefore, MBNA's complaint should not have been dismissed even if the Agreement did not contain Goodman's signature").

### B.   The Pending Controversy between Mr. Alonso and American Express is Subject to the Arbitration Provision

When a valid agreement to arbitrate exists, an "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc.*, 475 U.S. at 650.   Any doubts regarding the scope of arbitrable issues "should be resolved in favor of coverage." *Id.* Where the arbitration provision is broad, there is a heightened presumption of arbitrability, such that "[in] the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id.* (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584-85 (1960)).

The Arbitration Provision here expressly covers the types of claims brought by Mr. Alonso in his Complaint against American Express regarding payment owed by or to Mr. Alonso.   The Arbitration Provision broadly encompasses "any current or

future claim, dispute or controversy relating to your Account(s), this Agreement, or any agreement or relationship you have or had with us, except for the validity, enforceability or scope of the Arbitration provision." *Cardmember Agreement: Part 2 of 2* at 6. The Agreement specifies that "claim" includes "claims based upon contract, tort, fraud, statute, regulation, common law and equity" and expressly includes "claims by or against any third party using or providing any product, service or benefit in connection with any account; and claims that arise from or relate to any account created under any of the agreements, or any balances on any such account." *Id.*

Because Mr. Alonso's claims are founded upon a question of contractual terms and obligations, they "arise from or relate to" the Account or "services related to card membership." *Cardmember Agreement: Part 2 of 2* at 6. Mr. Alonso's claims also concern "balances on" his account. *Id. See Fantastic Sams Franchise Corp. v. FSRO Ass'n*, 683 F.3d 18, 21 (1st Cir. 2012) (affirming the district court's decision that "a matter of contract interpretation which the parties have agreed to submit to arbitration" must be decided by the arbitrator because "[t]he arbitration clause in those contracts is very broad and applies, without qualification, to all controversies or claims arising from or related to the contract, including issues of interpretation and breach") (internal quotation marks omitted) (quoting *Fantastic Sams Franchise Corp. v. FSRO Ass'n*, 824 F. Supp. 2d 221, 225 (D. Mass. 2011)); *see also Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720-21 (9th Cir. 1999) (concluding a clause requiring arbitration of any dispute "arising in connection with" reached every dispute between

the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract). The Court concludes that the broad contractual language of the Agreement plainly covers Mr. Alonso's claims for declaratory and injunctive relief and defamation concerning his contractual obligations.

### C.   American Express did not Waive its Right to Enforce Arbitration, and the Provision is Mandatory and Binding on Jaime Alonso

The Court concludes American Express has not waived its right to enforce the Arbitration Provision. Mr. Alonso provides no caselaw to support his argument that American Express waived its right. Although Mr. Alonso claims "there is palpable prejudice flowing from American Express's delay here," *Pl.'s Opp'n* at 5, the Court notes that in its July 28, 2022 Answer to Mr. Alonso's Complaint, American Express pleaded as its first affirmative defense "Arbitration" and stated: "This Court lacks jurisdiction over Plaintiff's claims due to the presence of binding arbitration clauses contained in American Express's account agreement." *Answer* at 6. The Court concludes American Express timely notified Mr. Alonso of its intent to pursue arbitration and that American Express has not waived its right to enforce the Arbitration Provision.

There was some delay between July 28, 2022, when American Express answered Mr. Alonso's Complaint, and November 14, 2022, when American Express filed its motion to compel arbitration and motion to stay. But as the First Circuit has written, "[i]n considering whether a waiver can be implied, [courts should] start with

18

the strong federal policy favoring arbitration agreements." *Joca-Roca Real Estate, LLC v. Brennan*, 772 F.3d 945, 948 (1st Cir. 2014). "Given the strength of the policy, 'mere delay in seeking [arbitration] without some resultant prejudice' is insufficient to ground a finding of conduct-based waiver." *Id.* (quoting *Creative Solutions Grp., Inc. v. Pentzer Corp.*, 252 F.3d 28, 32 (1st Cir. 2001)). Moreover, "[t]he party advocating waiver has the burden of demonstrating prejudice." *Id.*

In *Joca-Roca*, the First Circuit described the factors a court should consider in determining whether there exists a conduct-based waiver:

> That determination is informed by a salmagundi of factors, including: the length of the delay, the extent to which the party seeking to invoke arbitration has participated in the litigation, the quantum of discovery and other litigation-related activities that have already taken place, the proximity of the arbitration demand to an anticipated trial date, and the extent to which the party opposing arbitration would be prejudiced.

*Id.*

Here, American Express raised mandatory arbitration in its Answer. *Joca-Roca*, 772 F.3d at 949 ("The defendant . . . reminded the plaintiff of the availability of arbitration through an affirmative defense. The plaintiff turned a blind eye to this reminder . . ."). American Express filed its motions less than three months after its Answer. Mr. Alonso says that he "incurred the expense of propounding discovery on American Express, noticing and preparing for a Fed. R. Civ. P. 30(b)(6) deposition of Amex, and identifying and disclosing an expert witness to support his claims in this case." *Pl.'s Opp'n* at 4-5. But Mr. Alonso has not identified any costs associated with these activities nor has he asserted that his discovery and strategic efforts in this case will not be useful in the upcoming arbitration proceeding. By contrast, American

Express denies that it participated in the litigation, and there is no evidence that it initiated discovery in federal court. *Def.'s Reply* at 7 ("American Express . . . did not take advantage of discovery procedures available in federal court"). American Express filed its motions within the original discovery period and before the original dispositive motion deadline. *See Scheduling Order* at 2 (ECF No. 13). The contemplated trial date in the Scheduling Order was March 6, 2023, nearly four months away. Nor is a delay of three months from answer to motion indicative of conduct-based waiver. After all, American Express' counsel was required to research, write, and prepare its motions, and a three-month period to do so does not strike the Court as unreasonable. *See Joca-Roca*, 772 F.3d at 949 ("The plaintiff . . . waited more than eight months before seeking a stay in order to pursue arbitration. By that time, the close of discovery was hard at hand, a summary judgment motion was in the offing, and trial was less than two months away"). In short, Mr. Alonso has not sustained his burden to demonstrate that American Express engaged in conduct-based waiver of the arbitration provision.

Likewise, although Mr. Alonso argues that American Express cannot show the Agreement binds him because he applied for the credit card with Mr. Alonso as the Basic Cardmember and Wospac as the associated business, Mr. Alonso provides no caselaw to support this argument. Mr. Alonso used his own name and social security number to open the account. He himself admits that the Agreement "facially seems to have been directed to Jaime Alonso as cardmember." *Pl.'s Opp'n* at 4.

The Court readily concludes that the Agreement binds Mr. Alonso as cardmember. The Cardmember Agreement clearly provides that "***Cardmember*** means the person who applied for this Account or to whom we address billing statements." *Cardmember Agreement: Part 2 of 2* at 1. There is no reason to conclude that Cardmember means someone or something other than Mr. Alonso. If there is any ambiguity, which there is not, the Cardmember Agreement distinguishes between the Cardmember, namely Mr. Alonso, and Wospac, the business, when it states that "***Company*** means the business for which the Account is established" and "***You*** and ***your*** mean the Basic Cardmember and the Company."

Mr. Alonso further argues that the Arbitration Provision is not mandatory and creates a "permissive arbitration dynamic." *Pl.'s Opp'n* at 2. Mr. Alonso contends that the language of the Cardmember Agreement provides that the Cardmember and American Express have the discretion to resolve disputes either by arbitration or otherwise. *Id.* (quoting "*You or we may elect to resolve any claim by individual arbitration*"). Here, Mr. Alonso filed a lawsuit against American Express in York County Superior Court on April 11, 2022. *State Ct. R.* Attach. 1, *Docket R.* at 1. After American Express removed this case to this Court, it answered Mr. Alonso's Complaint on July 28, 2022 and, in its answer, it asserted binding arbitration as an affirmative defense. *Def. Am. Express Nat'l Bank's Answer to Compl.* at 6 (ECF No. 12). American Express' demand for arbitration in its answer constitutes its election to resolve the claim by arbitration under the Cardmember Agreement.

In response, Mr. Alonso maintains that American Express has not even yet elected arbitration because it has not yet referred the matter to JAMS or AAA. *Pl.'s Opp'n* at 2 ("An arbitration begins through the submission of a claim or dispute for resolution to either JAMS or AAA, with the party pushing arbitration initially choosing an arbitrator"). Mr. Alonso writes that "[o]nce arbitration is initiated by the filing of an arbitration with JAMS or AAA, that election generally bears, under the terms of the Cardmember Agreement, upon the rights of the parties to pursue the same claims in Court." *Id.* Mr. Alonso argues that he may file a lawsuit against American Express and the lawsuit "is only cut off once the other side chooses to proceed via arbitration by actually, timely initiating one." *Id.*

Mr. Alonso's position misreads the Cardmember Agreement. The Cardmember Agreement states that that either the Cardmember or American Express "may elect to resolve any claim by individual arbitration." *Cardmember Agreement: Part 2 of 2* at 12. Once an election is made, claims "are decided by a neutral arbitrator." *Id.* The remainder of the arbitration provision describes the process once arbitration is elected, namely the parties may choose either JAMS or AAA and begin the referral process to the chosen arbitrator. *Id.* Mr. Alonso's argument improperly conflates the arbitration election and the procedure for arbitration once the election is made.

Furthermore, here, Mr. Alonso filed a lawsuit against American Express in state of Maine Superior Court. Mr. Alonso's position would require American Express to make a referral to JAMS or AAA while this lawsuit is pending, a requirement that does not appear in the Cardmember Agreement nor would it make any common sense.

Instead, American Express has properly moved this Court to stay this proceeding so that the arbitration procedure may proceed.

The Court concludes the express language of the Arbitration Provision to require arbitration when either Mr. Alonso or American Express requests arbitration. *Id.* at 6 ("If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or have a jury trial on that claim"). The Court therefore concludes the provision is mandatory and because American Express elected arbitration, once elected, arbitration is mandatory. Because the Agreement is valid and binding on Mr. Alonso, the Arbitration Provision is enforceable and mandatory, and the claims at issue are properly encompassed by the Agreement, arbitration is required here.

### D.      Stay of the Pending Litigation

American Express argues that "[u]nder the FAA, the instant action should be stayed pending arbitration." *Def.'s Mot.* at 11. The Court agrees. When a suit is brought regarding "any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration . . . shall . . . stay the trial of the action until such arbitration has been had . . . ." 9 U.S.C. § 3; *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, (2019) ("Section 3 provides that a court must stay litigation 'upon being satisfied that the issue' is 'referable to arbitration' under the 'agreement'"); *see also Oliveira v. New Prime, Inc.*, 857 F.3d 7, 12 (1st Cir. 2017) ("under [9 U.S.C.] § 3, a party may obtain a stay of

federal-court litigation pending arbitration"); *Collins v. Burlington N. R.R. Co.*, 867 F.2d 542, 545 (9th Cir. 1989) (remanding case where district court failed to consider whether a stay was appropriate as a result of binding arbitration agreement).  The Court concludes that here, where it has determined that arbitration is required, the Court must "stay the trial of the action until such arbitration has been had."  9 U.S.C. § 3.

## V.    CONCLUSION

The Court thereby GRANTS Defendant's Motion to Compel Arbitration and Stay Action (ECF No. 16).  To maintain control of its docket, the Court ORDERS American Express Company to file a status report every six months to update the Court as to the status of the arbitration.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 17th day of January, 2023